UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                :

SAMUEL BLUNT,

                                                :

              Petitioner,                         REPORT AND

                                            :         RECOMMENDATION

        -v.-

                                            :         14 Civ. 2333 (AT) (GWG)

ADA PEREZ,

                                            :

             Respondent.

                                            :
------------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Samuel Blunt, currently an inmate at Downstate Correctional Facility in Fishkill, New

York, brings this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] For

the following reasons, Blunt's petition should be denied.

I.      BACKGROUND

      On August 13, 2010, Blunt and a co-defendant, Jesus Tavarez, were indicted for criminal

sale of a controlled substance in the first degree, N.Y. Penal Law § 220.43(1); criminal

possession of a controlled substance in the first degree, N.Y. Penal Law § 220.21(1); and

criminal possession of a controlled substance in the third degree, N.Y. Penal Law § 220.16(1).

---

[1] See Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, filed Mar. 26, 2014 (Docket # 2) ("Pet."); Answer in Opposition to the Petition for a Writ of Habeas Corpus, filed June 13, 2014 (Docket # 10) ("Opp."); Respondent's Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus, filed June 13, 2014 (Docket # 11) ("Resp. Mem."); State Court Records and Proceedings Pursuant to Local Rule 81, filed June 13, 2014 (Docket # 12) ("State Court Transcript"); Letter from Samuel Blunt, filed July 28, 2014 (Docket # 18) ("Blunt Ltr.").

(SR: 286-88).[2]  On March 16, 2011, the Hon. Edward J. McLaughlin held a hearing on the

defendants' motion to suppress.  (See H: 12).  Following the hearing, Justice McLaughlin denied

the motion.  (See H: 65-66).  Blunt's trial began the same day with jury selection.

     A.     The Trial

     The following evidence was adduced at trial:

          1.     The Prosecution's Case

     In July 2010, Detective Brian Fleming of the New York City Police Department received

a phone call from a detective from Rollins, North Carolina, about setting up a drug transaction.

(Fleming: Tr. 181-84).  Detective Fleming was given the telephone number of an informant,

identified as "J" or "JB," and from then on Detective Fleming spoke to JB exclusively by

telephone.  (Fleming: Tr. 184-85).  JB never came to New York and never met Detective

Fleming in person.  (Fleming: Tr. 185).

     Over the course of a month, Detective Fleming spoke with JB approximately 20 times.

(Fleming: Tr. 185-86).  JB told Detective Fleming that he knew of people in the drug business in

New York, and that he had contacts there who could get Detective Fleming cocaine.  (Fleming:

Tr. 239).  Based on the information provided by JB, Detective Fleming initiated an investigation

against a man identified as "Harris" (Fleming: Tr. 186-87), who was later determined to be Blunt

---

     [2] "SR:" refers to the original pagination of the State Court Record, filed June 13, 2014
(annexed to Opp.).  "Tr." refers to the original pagination of the trial transcript.  See Transcript
of Proceedings Before the Hon. Edward McLaughlin, dated Mar. 21 to 25, 2011 (annexed as
attachments # 2 [ECF Pages 49-160], # 3, and # 4 [ECF Pages 1-302] to State Court Transcript).
Citations with the prefix "S:" refer to the original pagination of the sentencing proceedings.  See
Transcript of Sentence, dated April 26, 2010 [sic] (annexed as attachment # 4 [ECF Pages 303-
09] to State Court Transcript).  Citations with the prefix "H:" refer to the original pagination of
the pre-trial suppression hearing.  See State Court Transcript at 1-66 (Transcript of Hearings
dated March 16, 2011).

(Fleming: Tr. 237).  JB gave Detective Fleming Blunt's phone number and address.  (Fleming: Tr. 187, 239).  JB agreed to contact Blunt and introduce him to an undercover police officer to set up a drug transaction.  (Fleming: Tr. 241-42).  JB then contacted Blunt and worked out the price and quantity of drugs that the undercover would purchase.  (Fleming: Tr. 246).

     Detective Michael Fantroy was assigned to the case as an undercover officer, who would pose as an individual coming to New York City from North Carolina on behalf of a group of people who had collected $21,000 to purchase 500 grams of cocaine and two ounces of heroin.  (Fantroy: Tr. 5, 84).  Detective Fantroy was given information about the drug transaction, including Blunt's phone number and his nickname "Harris," and eventually Detective Fantroy made contact with Blunt to set up the drug transaction.  (Fantroy: Tr. 5, 9).  On August 3 and 4, 2010, Detective Fantroy, posing as "Mike," contacted Blunt, introduced himself, and said he was coming to New York from North Carolina to buy and pick up narcotics.  (Fantroy: Tr. 4-5, 19).  Detective Fantroy believed that Blunt had already spoken with JB, and knew the price and quantity of the drugs to be sold.  (Fantroy: Tr. 89).  Detective Fantroy told Blunt that he was not going to stay in New York City long, and was just going to pay for the narcotics, pick them up, and return to North Carolina.  (Fantroy: Tr. 6).

     Detective Fantroy told Blunt that he wanted to meet on 125th Street and Broadway in Manhattan, but Blunt wanted Detective Fantroy to come to the Bronx because Blunt did not have transportation.  (Id.).  Blunt and Detective Fantroy eventually agreed to meet at a McDonald's parking lot at 125th Street and Broadway in Manhattan.  (Fantroy: Tr. 7, 14; SR: 252).  Blunt said he would get his girlfriend's car.  (Fantroy: Tr. 8).  Blunt told Detective Fantroy that he was still trying to contact the individual who had the narcotics.  (Fantroy: Tr. 7-8).  He also told Detective Fantroy that he could not get the heroin but would get 80 additional grams of cocaine

3

instead for the same total price of $21,000.  (Fantroy: Tr. 8-9).

Around 11:00 a.m., on August 4, 2010, a field team, including Detective Fleming and other officers, were positioned around the McDonald's.  (Fantroy: Tr. 15, 17; Fleming: Tr. 190-95, 211-12).  Detective Fantroy wore a recording device, called a Kel transmitter, which allowed the field team to listen in on Detective Fantroy's conversations.  (Fantroy: Tr. 16, 93-94; Fleming: Tr. 252-53).  Detective Fantroy received a call from a member of the field team that a man who fit the description of Blunt, a black male who was about 6'3" and wearing a yellow shirt, was in the parking lot.  (Fantroy: Tr. 17-18).  Detective Fantroy drove into the McDonald's parking lot, parked, and called Blunt's phone.  (Fantroy: Tr. 18).  Through his rearview mirror, Detective Fantroy could see the man in the yellow shirt answer the phone.  (Id.).

Detective Fantroy described his car to Blunt, who then walked over and got into the passenger seat.  (Fantroy: Tr. 18-19).  Blunt introduced himself as "Harris."  (Fantroy: Tr. 19). Detective Fantroy asked to see the "product" and Blunt responded that "his man in the Bronx" had the product.  (Fantroy: Tr. 20).  Blunt then wanted Detective Fantroy to reposition his car so that they could see the entrance of the McDonald's, because the car was parked facing a wall. (Id.).  They got out of the vehicle, looked around for a different location, and parked the car so that it was facing the entrance of the McDonald's.  (Fantroy: Tr. 20-21).

When they got back into the vehicle, Blunt asked to see and count the money, and Detective Fantroy responded that he needed to see the product first.  (Fantroy: Tr. 21).  After some back and forth, Detective Fantroy allowed Blunt to see the money, but not to count it until he could see the product.  (Id.).  Both got out of the vehicle, and Detective Fantroy showed Blunt the money, which was in five or six bundles wrapped tightly with rubber bands located under the spare tire in the trunk of Detective Fantroy's car.  (Fantroy: Tr. 21-22).  In reality, the bundles of

4

money were only hundred-dollar-bills wrapped around much lower denominations.  (Fantroy: Tr. 22-23).

They both got back in the car and Blunt made a phone call using the speaker of his phone, thereby allowing Detective Fantroy to hear both sides of the conversation.  (Fantroy: Tr. 24).  The individual on the phone asked whether Blunt counted the money.  (Fantroy: Tr. 24-25).  Blunt said he saw the money but did not count it.  (Fantroy: Tr. 25).  The individual told Blunt he needed to count the money before he would bring the drugs, but Detective Fantroy insisted that he would not allow Blunt to count the money until he was shown the drugs.  (Id.).

The individual on the phone then said he would not go to Detective Fantroy's location because the area was "hot," meaning there were a lot of police officers in the area.  (Fantroy: Tr. 27).  The individual on the phone proposed to meet Blunt and Detective Fantroy at 125th Street and Second Avenue.  (Fantroy: Tr. 28).  Detective Fantroy asked Blunt to get out of his car, and then called his field team to inform them of the new proposed location.  (Fantroy: Tr. 29-30).  Detective Fantroy then told Blunt they could meet at that location.  (Fantroy: Tr. 30-31).  Blunt asked to ride with Detective Fantroy to the new location, but Detective Fantroy told him to take his own car because "no one rides in [his] front seat."  (Fantroy: Tr. 31).

The two men then drove to a gas station on 125th Street and Second Avenue.  (Id.).  Blunt got out of his vehicle and told Detective Fantroy where to park.  (Fantroy: Tr. 32).  Blunt then got into Detective Fantroy's car and the two waited approximately 10 to 15 minutes.  (Fantroy: Tr. 32).  Detective Fantroy asked Blunt to buy him a cup of coffee from the Dunkin Donuts, and Blunt did so.  (Fantroy: Tr. 33).  After Blunt returned, a silver car pulled up in front of where they were parked.  (Id.).  Blunt indicated that this was the man with the drugs, and he walked over to the silver car to speak with the driver.  (Fantroy: Tr. 33-34).  Detective Fantroy

could see that the driver was a Hispanic man, who was later identified as co-defendant Tavarez. (Fantroy: Tr. 34; Fleming: Tr. 254).  Blunt then told Detective Fantroy to follow the silver car to 127th Street and Third Avenue.  (Fantroy: Tr. 34-35).  Detective Fantroy again informed his field team of the change in location.  (Fleming: Tr. 217).

Blunt and Detective Fantroy stopped their cars at 127th Street between Second and Third Avenues.  (Fantroy: Tr. 36-37).  A few minutes later, Tavarez arrived behind Detective Fantroy's car.  (Fantroy: Tr. 37).  Blunt walked up to Detective Fantroy's car and told Detective Fantroy, "Go back there to the passenger's side . . . front seat.  My man is going to show you the product. You are going to take a look at it and you are going to count this money."  (Fantroy: Tr. 37-38). Detective Fantroy then got into the car with Tavarez, where Tavarez showed him the cocaine. (Fantroy: Tr. 38-41).

Detective Fantroy got out of Tavarez's car, walked back to his own car, and told Fantroy to get in the front seat. (Fantroy: Tr. 41-45).  When Blunt walked towards his car, the field team arrived and arrested him.  (Fantroy: Tr. 45-46).  Detective Christopher Bastos searched Blunt and recovered his cell phone and $324 in cash.  (Bastos: Tr. 157-61).

Detective Fleming arrived at the scene as Tavarez was trying to pull out of a parking space in the silver car.  (Fleming: Tr. 222-23).  Detective Fleming stopped the car and arrested Tavarez.  (Fleming: Tr. 223).  After speaking with Detective Fantroy, Detective Fleming searched the center console of the car and recovered six large bags of cocaine.  (Fleming: Tr. 225-26; Trakansoot: Tr. 165, 174).

Blunt never touched the drugs or the money.  (Fantroy: Tr. 132, 147).  The car Blunt was using was later released to its owner, Shawntel Dunbar.  (Fleming: Tr. 230-31).

6

2.    The Defense's Case

Blunt testified on his own behalf.  He admitted that he had been convicted of attempted robbery in 1990 and another felony in 1997.  (Blunt: Tr. 263-64).  JB was a childhood friend, who grew up in the same Manhattan apartment building as he did.  (Blunt: Tr. 264).  They had been friends for more than 30 years.  (Id.).  However, the two had lost contact as they grew up and, as of 2010, Blunt had not spoken with JB since the mid-1990s.  (Blunt: Tr. 264-65, 284-85).  Around April or May 2010, JB contacted Blunt.  (Blunt: Tr. 265).  They talked about how they were doing but did not discuss drugs.  (Blunt: Tr. 265-67).

They spoke several times afterwards.  (Blunt: Tr. 267).  During one call, JB mentioned that he was selling drugs and Blunt ended the conversation.  (Id.).  The two later got back in touch and JB asked Blunt if Blunt could get in touch with someone named Eric in Manhattan for him.  (Blunt: Tr. 268, 287).  Blunt said he was not familiar with the person because he had moved to the Bronx.  (Blunt: Tr. 268-69).

Near the summer of 2010, Blunt met Eric at a cookout and got his phone number.  (Blunt: Tr. 269, 287).  In August, Blunt started talking with JB again and JB said that he was upset that Eric robbed him of drugs and JB wanted to get back at him.  (Blunt: Tr. 269-271).

JB then called Blunt to ask him to get in contact with someone else so that he could get drugs.  (Blunt: Tr. 271).  JB named several people but Blunt refused.  (Blunt: Tr. 271-72).  JB called again and asked Blunt to meet someone for him.  (Blunt: Tr. 272-73).  JB had explained that the person was going to meet some friend but was scared and JB didn't want him to get "beat like he did at the last occurrence."  (Id.).  Blunt brushed JB off twice but eventually called JB back and asked what JB needed him to do.  (Id.).  JB said he needed Blunt to go to Manhattan to meet his friend Mike — who Blunt later learned was Detective Fantroy (Blunt: Tr. 288) —

7

who was going to "go and handle his business" (Blunt: Tr. 273).  JB needed Blunt to "make sure he all right." (<u>Id.</u>).  JB then gave Blunt Detective Fantroy's phone number.  (<u>Id.</u>).  Blunt knew that it was going to be a drug deal.  (Blunt: Tr. 283).

Blunt called Detective Fantroy, and Detective Fantroy asked Blunt to meet him at the McDonald's on 125th Street and Broadway.  (Blunt: Tr. 274-75).  Blunt said he did not have a car and needed Detective Fantroy to come pick him up.  (Blunt: Tr. 274).  Blunt then called his girlfriend and borrowed her car.  (<u>Id.</u>).  Blunt drove to the McDonald's on 125th Street and Broadway, where Detective Fantroy was waiting.  (Blunt: Tr. 275).  Blunt went to Detective Fantroy's car and Detective Fantroy told him that JB had set something up for him, and he just needed Blunt to make sure he was "all right." (<u>Id.</u>).  While they were waiting, Detective Fantroy received a phone call, and Blunt called JB at the same time.  (<u>Id.</u>).  JB told Blunt that he was going to call "this guy" (<u>id.</u>) — who Blunt later learned was Tavarez (Blunt: Tr. 300).  JB then called back and told Blunt that "the guy" did not want to meet them at their current location.  (Blunt: Tr. 276).

Blunt eventually called Tavarez with Detective Fantroy present.  (Blunt: Tr. 301).  Blunt tried to get Detective Fantroy to go to the Bronx, but Detective Fantroy refused and they agreed to go to a gas station on 127th Street.  (Blunt: Tr. 276).  After Detective Fantroy and Blunt arrived, Tavarez called Blunt as he was pulling up in front of them.  (Blunt: Tr. 276-77).  Tavarez told them to follow him to 127th Street and Third Avenue.  (Blunt: Tr. 277).

Once they arrived, Detective Fantroy went to Tavarez's car.  (Blunt: Tr. 278).  Blunt was still in his own car watching.  (<u>Id.</u>).  Blunt saw Detective Fantroy walk to Tavarez's car and then walk back to his own car.  (<u>Id.</u>).  Detective Fantroy then called Blunt over to his car.  (<u>Id.</u>).  When Blunt got out of his car, police rushed him, told him to get on the ground, and then started

to beat him with a "billy club" before arresting him.  (Blunt: Tr. 278, 304).

Blunt received no money and was never promised anything for his role in the drug transaction.  (Blunt: Tr. 279).  Blunt never saw any drugs on that day.  (Id.).  He never knew the details of the transaction (Blunt: Tr. 280), although he knew it was going to be a drug deal (Blunt: Tr. 283).  He only participated as a favor to JB.  (Blunt: Tr. 279, 314-15).  Blunt also stated, "It's not like I was obligated to do anything, so I just did it.  It's, like, nothing to me." (Blunt: Tr. 279).

Blunt called Shawntel Dunbar as a witness.  Dunbar had had a relationship with Blunt and was the mother of one of his children.  (Dunbar: Tr. 258).  She stated that the car used by Blunt was not hers and that she never picked the car up from the police.  (Dunbar: Tr. 258-59).

### 3.    The Jury Charge

During the charge conference, Blunt's counsel requested "agency, entrapment and missing witness charge[s]."  (Tr. 338).  Blunt's counsel argued that Blunt did what he did because a friend kept calling until he gave in, and he would not have done it otherwise.  (Tr. 351).  After hearing argument, the court ruled that it was "not charging entrapment.  Defense didn't make anything approaching an affirmative demonstration."  (Tr. 356).  The court noted that Blunt acknowledged calling JB back at least once, which was not "conduct where one is trying to distance themselves or silently communicate an absence of interest or an affirmative desire to disengage."  (Id.).

### 4.    Verdict and Sentence

A jury convicted Blunt of criminal sale of a controlled substance in the first degree, N.Y. Penal Law § 220.43(1), criminal possession of a controlled substance in the first degree, N.Y. Penal Law § 220.21(1), and criminal possession of a controlled substance in the third degree,

N.Y. Penal Law § 220.16(1).  (Tr. 496-97).  On April 26, 2011, the court sentenced Blunt to two concurrent prison terms of 13 years for the two first-degree sale and possession counts, each followed by five years of post-release supervision, and a concurrent prison term of 10 years for the third-degree possession count, followed by a year of post-release supervision.  (S. 7; see SR: 285).  The 10 years for the third-degree possession count was later reduced to a nine-year prison term to be followed by two years of post-release supervision to comply with the lawful sentencing range for that offense.  (See SR: 285).

      B.    Direct Appeal

Blunt, represented by counsel, filed a brief in the Appellate Division, First Department. (SR: 001-039).  Blunt argued that the trial court erred by refusing to charge the affirmative defense of entrapment to the jury and that his 13-year prison sentence was excessive and unduly harsh.  (Id.)  The People filed a brief in opposition.  (SR: 040-098).  Blunt then filed a pro se supplemental brief, in which he argued that he was denied his statutory right to testify before the grand jury, that his counsel was ineffective for failing to object to the indictment on that basis, and that he was entitled to a missing witness instruction and to the production of related impeachment material.  (SR: 100-39).  The People filed a brief in opposition to Blunt's pro se supplemental brief.  (SR: 140-78).

On October 31, 2013, the Appellate Division affirmed Blunt's conviction.  People v. Blunt, 110 A.D.3d 635 (1st Dep't 2013).  The Appellate Division found that the trial court "properly denied [Blunt's] request for an instruction on the affirmative defense of entrapment." Id. at 635.  Specifically, it found "[t]here was no reasonable view of the evidence, viewed most favorably to [Blunt], that the police actively induced or encouraged him commit [sic] the crime, or that any police conduct . . . created a substantial risk that [Blunt] would commit the crime

10

although not otherwise disposed to do so." Id. at 635-36 (internal citations omitted).  It noted that "[t]he record demonstrates that the police merely afforded [Blunt] the opportunity to commit the crime, that he was disposed to commit it, and that he engaged in salesman-like behavior. [Blunt's] own testimony tended to negate the elements of the entrapment defense." Id. at 636. The court also held that it "considered and rejected [Blunt's] pro se claims." Id.

On November 1, 2013, Blunt sought leave to appeal based on his request for an entrapment instruction and "all issues raised" in the Appellate Division briefs.  (SR: 299-302). On January 14, 2014, the Court of Appeals denied leave.  People v. Blunt, 22 N.Y.3d 1087 (2014); (SR: 307).

C.     The Instant Petition for a Writ of Habeas Corpus

Blunt filed the instant petition pro se on March 26, 2014.  See Pet.  Blunt's petition raises the following four claims: (1) that the trial court lacked "subject matter" jurisdiction over his case;[3] (2) a ground entitled "Sixth Amendment — Due Process (indigent) speedy-trial, deprivation without counsel"; (3) that the suppression hearing was unfair because police officers' notes relating to the investigation were withheld from him; and (4) that the trial court should have instructed the jury on the affirmative defense of entrapment.  Pet. at 6-12. Respondent filed papers opposing the petition on June 13, 2014.  See Opp.; Resp. Mem.  On July 28, 2014, Blunt filed a letter in support of his petition.  See Blunt Ltr.

---

[3] This claim is described as follows:

Accusatory instrument not the proper form for capital offense mode of proceeding, organization of the court defect.  Non-waivable felony complaint — triple hearsay, omitted facts certificate of appealability sentence and commitment order — void.  Defense was never formaly [sic] provided with charges.

Pet. at 6 (emphasis omitted).

11

II.   APPLICABLE LAW

    A.    Legal Standard for Petitions Brought Pursuant to 28 U.S.C. § 2254

A petition for a writ of habeas corpus may not be granted with respect to any claim that

has been "adjudicated on the merits" in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For a claim to be "adjudicated on the merits" within the meaning of section 2254(d), it

must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the

substance of the claim advanced, rather than on a procedural, or other, ground."  Sellan v.

Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citations omitted).  As long as "there is nothing in

its decision to indicate that the claims were decided on anything but substantive grounds," a

claim will be considered "adjudicated on the merits" even if the state court fails to mention the

federal claim and cites no relevant federal case law.  Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir.

2001); accord Harrington v. Richter, 562 U.S. 86, 99 (2011) ("When a federal claim has been

presented to a state court and the state court has denied relief, it may be presumed that the state

court adjudicated the claim on the merits in the absence of any indication or state-law procedural

principles to the contrary.") (citation omitted); see also id. at 98 (section 2254(d) deference

applies even "[w]here a state court's decision is unaccompanied by an explanation").  Moreover,

a state court's "determination of a factual issue" is "presumed to be correct," and that

presumption may be rebutted only "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  Habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Id. at 411.  Rather, the state court's application must have been unreasonable — a standard that is met only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. Harrington, 562 U.S. at 102; accord id. ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.") (citation omitted).  In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 103; see also Woods v. Donald, 2015 WL 1400852, at *4 (U.S. March 30, 2015) (an "extreme malfunction" by the state court in applying Supreme Court precedent is "required for federal habeas relief") (citation and internal quotation marks omitted).

The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question."  Brisco v. Ercole, 565 F.3d 80,

89 (2d Cir. 2009). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Thus, "where the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." Woods, 2015 WL 1400852, at *4 (internal punctuation and citation omitted); accord Brisco, 565 F.3d at 90 (a court applying a "fact-dependent standard . . . to the facts of a specific case is . . . entitled to significant 'leeway' when [a habeas court] review[s] its decision for reasonableness") (quoting Yarborough, 541 U.S. at 664).

Only holdings of the Supreme Court are considered for purposes of determining "[c]learly established federal law." Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir. 2008) (citation and internal quotation marks omitted). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Id. at 106-07 (citation omitted). Where there is "[n]o holding" from the Supreme Court on the question presented, Carey v. Musladin, 549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer" to the question presented in the petition, Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam), a state court's decision can be neither contrary to nor an unreasonable application of clearly established federal law, see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (citations and internal quotation marks omitted).

B.    Exhaustion

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must

exhaust his remedies in state court."  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see 28

U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court shall not be granted unless it appears that . . .

the applicant has exhausted the remedies available in the courts of the State.").  The Supreme

Court has held:

> Because the exhaustion doctrine is designed to give the state courts a full and fair
> opportunity to resolve federal constitutional claims before those claims are
> presented to the federal courts . . . state prisoners must give the state courts one
> full opportunity to resolve any constitutional issues by invoking one complete
> round of the State's established appellate review process.

O'Sullivan, 526 U.S. at 845; accord Smith v. Duncan, 411 F.3d 340, 347 (2d Cir. 2005).  Thus, a

petitioner is required to have presented each claim to all available levels of the state courts.  See,

e.g., Baldwin v. Reese, 541 U.S. 27, 29 (2004) ("[T]he prisoner must fairly present his claim in

each appropriate state court (including a state supreme court with powers of discretionary

review.")) (citations and internal quotation marks omitted).  The petitioner must also have fairly

presented the "federal nature" of each claim to the state courts.  Id.; Duncan v. Henry, 513 U.S.

364, 365-66 (1995) (per curiam); Rosa v. McCray, 396 F.3d 210, 217 (2d Cir. 2005).

III.    DISCUSSION

The Court notes that because Blunt is a pro se litigant, we hold his submissions "to less

stringent standards than formal pleadings drafted by lawyers."  Hughes v. Rowe, 449 U.S. 5, 9

(1980) (citations and internal quotation marks omitted) (per curiam); accord Scales v. N.Y. State

Div. of Parole, 396 F. Supp. 2d 423, 428 (S.D.N.Y. 2005).  Additionally, we construe his

submissions "liberally."  E.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (citation

15

omitted).

A.    Exhaustion

Respondent contends that the only claim that Blunt has exhausted is Blunt's claim that the trial court should have instructed the jury on the affirmative defense of entrapment. Resp. Mem. at 16. Respondent argues that Blunt's "subject matter" jurisdiction claim and his second claim, which the respondent interprets as a deprivation of counsel claim, id. at 15, were not raised on direct appeal in either Blunt's main or pro se supplemental briefs, and that Blunt's suppression hearing claim was never presented in state court at all, id. at 17. Blunt asserts in his petition that he raised his claims relating to subject matter jurisdiction and his "Sixth Amendment" claim on direct appeal. See Pet. at 7, 8. Blunt does not claim that he raised his claim relating to the suppression hearing on direct appeal. Nor does he explain why he failed to raise the issue. See id. at 10.

An examination of the Appellate Division briefs reflects that no claim was raised regarding "subject matter jurisdiction" or the suppression hearing. We thus conclude that these claims are unexhausted. There is no point in staying the petition to allow Blunt to exhaust these claims, however, since they are based on evidence in the trial court record, Blunt has "already taken his one direct appeal, and th[ese] claim[s] [are] procedurally barred from consideration in a collateral attack on his conviction." Jimenez v. Walker, 458 F.3d 130, 149 (2d Cir. 2006) (citing N.Y. Crim. Proc. Law § 440.10(2)(c) (a court may not consider on collateral review a record-based claim that the defendant unjustifiably failed to raise on direct review)). When a petitioner fails to present a claim to each level of the state courts but is thereupon foreclosed from doing so by a state procedural rule, the petitioner's claim is "deemed exhausted" for purposes of federal habeas review. Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); accord

<u>Aparicio</u>, 269 F.3d at 90; <u>Bossett v. Walker</u>, 41 F.3d 825, 828-29 (2d Cir. 1994); <u>Grey v. Hoke</u>, 933 F.2d 117, 120-21 (2d Cir. 1991).  In these circumstances, the claim is "procedurally defaulted" and may be raised now "only if the [petitioner] can first demonstrate either cause and actual prejudice, or that he is actually innocent."  <u>Clark v. Perez</u>, 510 F.3d 382, 393 (2d Cir. 2008) (quoting <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998)); <u>accord</u> <u>Jimenez</u>, 458 F.3d at 149.  No such showing has been made here.

However, we construe the petition to raise certain other claims that were raised in Blunt's <u>pro se</u> supplemental brief to the Appellate Division.  In his brief, Blunt argued that he was "denied his statutory right to appear and testify before the grand jury," (SR: 106), and that defense counsel was ineffective because he failed to move to dismiss the indictment when Blunt was not permitted to testify before the grand jury (SR: 111).[4]  We will construe Ground 2 to raise these claims as well as the entrapment claim, which was raised in his counsel's brief to the Appellate Division (SR: 024-032).[5]  All these claims were raised in Blunt's letter seeking leave

_____

[4]  His <u>pro se</u> supplemental brief also argued that the "trial court abused discretion [sic] denying application for missing witness charge," (SR: 125).  The missing witness charge claim, however, is plainly not raised in Blunt's petition and thus we do not address it.

[5]  Each of the grounds listed in Blunt's petition contains language that seems to refer to matters straying far beyond the claims raised in the Appellate Division briefs.  <u>See</u>, <u>e.g.</u>, Pet. at 11 ("[F]raud, perjury, misrepresentation.  Grand jury minutes newly discovered evidence, contraband found on petitioner at precinct house, newly discovered from police plaza investigation after conviction.")  (emphasis omitted).  These statements are unexplained.  To the extent such statements are intended as separate bases for habeas relief, they are both unexhausted because they were not raised in the Appellate Division briefs and also violate Rule 2(c) of the Rules Governing Section 2254 Cases, which requires that a habeas petition "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground."  "It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief."  <u>Kimbrough v. Bradt</u>, 949 F. Supp. 2d 341, 355 (N.D.N.Y. 2013) (citing <u>Skeete v. New York</u>, 2003 WL 22709079, at *2 (E.D.N.Y. Nov. 17, 2003)).  We thus construe the petition to raise only the claims discussed above.

to appeal to the Court of Appeals.  (SR: 302).

Accordingly, we now address the merits of the following claims: (1) that Blunt was not permitted to testify before the grand jury; (2) that counsel was ineffective in failing to seek dismissal of the indictment based on the purported violation of Blunt's right to testify before the grand jury; and (3) that Blunt was improperly denied an entrapment instruction.

B.    Merits

1.    Inability to Testify/Appear Before Grand Jury

Because there is no federal constitutional right to a grand jury in a state criminal prosecution, see, e.g., Fields v. Soloff, 920 F.2d 1114, 1118 (2d Cir. 1990) (citation omitted), "claims of deficiencies in . . . state grand jury proceedings are [not] cognizable in a habeas corpus proceeding," Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989) (citing United States v. Mechanik, 475 U.S. 66 (1986)).  Additionally, the Supreme Court has specifically held that a criminal defendant has no federal constitutional right to appear or testify before a grand jury at all, even where such a right may have been created by statute.  See United States v. Williams, 504 U.S. 36, 52 (1992) ("[N]either in this country nor in England has the suspect under investigation by the grand jury ever been thought to have a right to testify or to have exculpatory evidence presented.") (citations omitted); accord Malik v. McGinnis, 2010 WL 3239216, at *18 (S.D.N.Y. Aug. 16, 2010); Lemons v. Parrott, 2002 WL 850028, at *5 (S.D.N.Y. May 2, 2002); Steed v. N.Y. Exec. Dep't Div. of Parole, 2000 WL 1593342, at *8 (S.D.N.Y. Oct. 25, 2000). Thus, courts routinely dismiss habeas claims based on a failure to accord a defendant his state law right to testify before a grand jury.  See, e.g., Moore v. Evans, 2012 WL 3577549, at *2 (S.D.N.Y. Aug. 20, 2012); Rojas v. Woods, 2008 WL 2875082, at *8 (S.D.N.Y. July 25, 2008); Burwell v. Superintendent of Fishkill Corr. Facility, 2008 WL 2704319, at *8 (S.D.N.Y. July 10,

2008); Dixon v. McGinnis, 492 F. Supp. 2d 343, 347 n.2 (S.D.N.Y. 2007).  Accordingly, Blunt's

claim that he was deprived of the right to testify before the grand jury should be denied.

2.     <u>Ineffective Assistance of Counsel</u>

In order to prove ineffective assistance of counsel, a petitioner must show (1) "that

'counsel's representation fell below an objective standard of reasonableness'"; and (2) that there

is a "'reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.'"  Harrington, 562 U.S. at 104 (quoting Strickland v.

Washington, 466 U.S. 668, 694 (1984)); accord United States v. Brown, 623 F.3d 104, 112 (2d

Cir. 2010).  In evaluating the first prong — whether counsel's performance fell below an

objective standard of reasonableness — "'[j]udicial scrutiny . . . must be highly deferential,'"

and the petitioner must overcome the "'presumption that, under the circumstances, the

challenged action might be considered sound trial strategy.'"  Bell v. Cone, 535 U.S. 685, 698

(2002) (alteration in original) (quoting Strickland, 466 U.S. at 689).  This is because Strickland

embodies a "strong presumption of effectiveness." Burt v. Titlow, 134 S. Ct. 10, 18 (2013); see

Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according counsel a presumption of

competence).  This analysis requires a court to "affirmatively entertain the range of possible

reasons [petitioner's] counsel may have had for proceeding as they did."  Cullen v. Pinholster,

131 S. Ct. 1388, 1407 (2011) (citations and internal quotation marks omitted).

To satisfy the prejudice requirement, "[i]t is not enough 'to show that the errors had some

conceivable effect on the outcome of the proceeding.'"  Harrington, 562 U.S. at 104 (quoting

Strickland, 466 U.S. at 693).  Rather, "[c]ounsel's errors must be 'so serious as to deprive the

[petitioner] of a fair trial, a trial whose result is reliable.'"  Id. (quoting Strickland, 466 U.S. at

687).  The Second Circuit generally "requires some objective evidence other than [petitioner's]

19

assertions to establish prejudice." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003)

(citing United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998) (per curiam)).

"The standards created by Strickland and § 2254(d) are both highly deferential . . . and

when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (internal

citations and quotation marks omitted).  A petitioner "must do more than show that he would

have satisfied Strickland's test if his claim were being analyzed in the first instance . . . .  Rather,

he must show that the [state court] applied Strickland to the facts of his case in an objectively

unreasonable manner." Bell, 535 U.S. at 698-99 (citation omitted).  Our task on habeas review

is limited, therefore, to asking whether the state court's "rejection of this claim amounted to an

unreasonable application of the Strickland standard." Aparicio, 269 F.3d at 99 (citing 28 U.S.C.

§ 2254(d)(1)).

In this case, the Appellate Division rejected Blunt's ineffective assistance claims on the

merits.  See Blunt, 110 A.D.3d at 636.  Thus, our task is limited to deciding whether this

determination was an unreasonable application of Strickland and therefore "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

It is not necessary to reach the question of whether counsel's conduct fell below an

objective standard of reasonableness because Blunt has not shown prejudice.  Even if Blunt's

attorney had filed a successful motion to dismiss the indictment based on Blunt's not having had

the opportunity to testify before the grand jury, there is no suggestion that there would have been

any bar to the People seeking leave to re-present the case to a new grand jury.  See N.Y. Crim.

Proc. Law § 210.20(4); see also People v. Morris, 93 N.Y.2d 908, 910 (1999) (there is no limit to

the number of times the People may seek leave to submit judicially dismissed charges to a grand

jury).  Nor, as was noted in a similar circumstance, is there any basis "to find that the outcome [of a new grand jury proceeding] would have been different had petitioner appeared at . . . the grand jury."  Fox v. Poole, 2008 WL 1991103, at *8 (E.D.N.Y. May 5, 2008) (rejecting claim of ineffective of assistance of counsel based on counsel's having waived defendant's right to testify before the grand jury).  In other words, there is no basis for finding a "reasonable probability" that a second grand jury would have refused to indict Blunt had he testified — particularly given that the evidence against Blunt was sufficient to meet the "beyond a reasonable doubt" standard applicable at trial.  Courts considering claims of ineffective assistance of counsel in similar circumstances have routinely refused to grant habeas relief.  See, e.g., Rojas, 2008 WL 2875082, at *7; Dixon, 492 F. Supp. 2d at 348 ("Although Dixon's attorney's failure to submit the N.Y.C.P.L. § 210.20 motion to dismiss the indictment within the five days allotted by N.Y.C.P.L. § 190.50(c) was negligent at best, and can certainly not be considered 'sound trial strategy,' Dixon has failed to demonstrate that the outcome of the proceedings would have been different had the motion been filed on time.") (citation omitted); see also Hirsh v. McArdle, 2015 WL 792238, at *11 (N.D.N.Y. Feb. 26, 2015) (holding that habeas petitioners are not entitled to habeas relief on claims that "counsel was ineffective for failing to secure [the petitioner's] right to testify before the grand jury") (citing cases).  This result is all the more obvious here given that Blunt actually testified at trial and that, notwithstanding his testimony, the jury convicted him under the "beyond a reasonable doubt" standard, which is far more demanding than the probable cause standard applied by the grand jury.  Accordingly, Blunt's claim that counsel was ineffective in not seeking dismissal based on the violation of his right to testify before the grand jury does not warrant habeas relief.

3.      Entrapment Instruction

"[I]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)) (internal quotation marks and additional citations omitted). Thus, "[w]here an error in a jury instruction is alleged, it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the [petitioner] by the Fourteenth Amendment." Id. at 123 (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)) (internal quotation marks omitted). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.  The question is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process." Middleton v. McNeil, 541 U.S. 433, 437 (2004) (citations and internal quotation marks omitted) (alteration in original).  The Second Circuit has noted that:

> The fact that "federal habeas corpus relief does not lie for errors of state law," Lewis v. Jeffers, 497 U.S. 764, 780 (1990), does not mean, however, that errors under state law cannot result in cognizable violations of a constitutional right to due process.  What due process requires will often depend on what state law is.  States are free to define the elements of, and defenses to, crimes.  See Apprendi v. New Jersey, 530 U.S. 466, 484-87 (2000); McMillan v. Pennsylvania, 477 U.S. 79, 84-86 (1986).  Once states have promulgated laws to define criminal conduct, however, federal due process protects a defendant from conviction unless he is shown in a fair proceeding to have violated those laws.

Davis, 270 F.3d at 123.

In this Circuit, courts undertake a three-step analysis before granting habeas relief to a

petitioner challenging a state court's refusal to give a jury instruction.  See Jackson v. Edwards, 404 F.3d 612, 621 (2d Cir. 2005) (citing Davis, 270 F.3d at 124); see also Vega v. Walsh, 258 F. App'x 356, 357-59 (2d Cir. 2007) (applying Davis where the state court failed to give an entrapment instruction).  "First, was [the petitioner] entitled to [the] charge [under state law]?  Second, if so, did the failure to give one result in a denial of due process?  Third, if so, did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law?"  Jackson, 404 F.3d at 621 (citing 28 U.S.C. § 2254).

New York Penal Law § 40.05 provides:

> In any prosecution for an offense, it is an affirmative defense that the defendant engaged in the proscribed conduct because he was induced or encouraged to do so by a public servant, or by a person acting in cooperation with a public servant, seeking to obtain evidence against him for purpose of criminal prosecution, and when the methods used to obtain such evidence were such as to create a substantial risk that the offense would be committed by a person not otherwise disposed to commit it.  Inducement or encouragement to commit an offense means active inducement or encouragement.  Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

Thus, to show that he was entitled under New York law to a jury instruction on entrapment, Blunt must show that his conduct was actively "induce[d] or encourage[d]" by official activity and that "the methods used to obtain such evidence were such as to create a substantial risk that the offense would be committed by a person not otherwise disposed to commit it."  Id.

In New York, "[t]he rule is that the jury must be instructed on all claimed defenses which are supported by a reasonable view of the evidence — not by any view of the evidence, however artificial or irrational."  People v Butts, 72 N.Y.2d 746, 750 (1988) (citation omitted) (emphasis in original).  "Where no reasonable view of the evidence would allow a reasonable jury to find that the statutory requirements of entrapment were satisfied, the defendant is not entitled to the instruction."  Hunt v. Superintendent, 2010 WL 5149279, at *21 (N.D.N.Y. Nov. 17, 2010)

(citing Vega, 258 F. App'x at 358).  "In determining whether the jury should be given a particular charge, the trial court must look to all of the evidence introduced at trial and view it in a light most favorable to the defendant."  People v. Dolan, 858 N.Y.S.2d 490, 492 (2008) (citations omitted).

In Ground Four of his petition, Blunt asserts that the trial court refused "to instruct on the affirmative defense of entrapment."  Pet. at 11.  On direct appeal, Blunt argued that he was denied due process under the Fourteenth Amendment and the New York Constitution due to the trial court's refusal to instruct the jury on entrapment.  (SR: 024-032).  The Appellate Division found:

> The [trial] court properly denied [Blunt's] request for an instruction on the affirmative defense of entrapment.  There was no reasonable view of the evidence, viewed most favorably to [Blunt], that the police actively induced or encouraged him commit the crime, or that any police conduct, including their use of a confidential informant who was [Blunt's] childhood friend, created a substantial risk that defendant would commit the crime although not otherwise disposed to do so (see Penal Law § 40.05; People v Brown, 82 N.Y.2d 869, 871-72 (1993); People v Butts, 72 N.Y.2d 746, 750 (1988)).  The record demonstrates that the police merely afforded [Blunt] the opportunity to commit the crime, that he was disposed to commit it, and that he engaged in salesman-like behavior.  [Blunt's] own testimony tended to negate the elements of the entrapment defense.

Blunt, 110 A.D.3d at 635-36.

Here, no reasonable view of the evidence, even when viewed in the light most favorable to Blunt, would permit the jury to conclude that the statutory elements of entrapment were satisfied.  While Blunt initially refused to help JB, it was Blunt who called JB back and acceded to JB's request to meet someone about a transaction that Blunt admittedly "knew" was going to be a drug deal.  (Blunt: Tr. 271-73, 283).  Further, it was Blunt who spoke with Detective Fantroy and helped set up the drug transaction.  The two of them spoke to select the initial

24

meeting location (see Blunt: Tr. 273-75; Fantroy: Tr. 6-7) and when Tavarez, the person with the drugs, refused to meet them there, Blunt tried to convince Detective Fantroy to meet Tavarez in the Bronx (Blunt: Tr. 276). Blunt also led Detective Fantroy to the second location to wait for Tavarez. (Fantroy: Tr. 30-32). When Tavarez arrived at that location, Blunt went over to speak with him, and Tavarez told Blunt to tell Detective Fantroy to follow him to yet another location. (Blunt: Tr. 277).

Further, there is no evidence here of inducement or encouragement. Indeed, Blunt testified that his motivation for committing the crime was that he wanted to do a favor for a friend. (See Blunt: Tr. 279). He testified that "It's not like I was obligated to do anything, so I just did it." (Id.). As noted by the Appellate Division, Blunt engaged in "salesman-like behavior" continuously throughout these events. Blunt, 110 A.D.3d at 636. Thus, the police "merely afforded [Blunt] an opportunity to commit the offense, which standing alone is insufficient to warrant an entrapment charge." Brown, 82 N.Y.2d at 871-72 (citations omitted); accord N.Y. Penal Law § 40.05 ("Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.").

IV.     CONCLUSION

For the foregoing reasons, Blunt's petition for a writ of habeas corpus should be denied.


**PROCEDURE FOR FILING OBJECTIONS TO THIS**
**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a),

25

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Analisa Torres at 500 Pearl Street, New York, New York

10007.  Any request for an extension of time to file objections must be directed to Judge Torres.

If a party fails to file timely objections, that party will not be permitted to raise any objections to

this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner

& Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84,

92 (2d Cir. 2010).

Dated: April 14, 2015
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy mailed to:

Samuel Blunt
11-A-2026
Downstate Correctional Facility
Box F
Red Schoolhouse Road
Fishkill, NY 12524-0445